IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RICKY N. ALEXANDER,

                    Petitioner,

    v.

PAUL KEMPER,[1]

                    Respondent.

OPINION and ORDER

17-cv-786-jdp

---

Petitioner Ricky Alexander, appearing pro se, is a prisoner incarcerated at Racine Correctional Institution. Alexander was charged with sexually assaulting two girls who lived in an apartment building in which he performed maintenance work. A mistrial was declared in his first trial after the jury could not agree on verdicts for both counts. He was convicted of both counts at his second trial.

Alexander seeks a writ of habeas corpus under 28 U.S.C. § 2254, contending that the convictions violated the Double Jeopardy Clause of the Fifth Amendment, that trial counsel and appellate counsel were ineffective, and that his due process rights were violated. The petition is fully briefed and ready for decision. For the reasons set forth below, I conclude that Alexander has failed to show a denial of his constitutional rights. I will deny his petition.

BACKGROUND

The following facts are taken from the petition and the state court records provided by Alexander and the state.

---

[1] I have amended the caption to name Kemper as the respondent because he is the warden of the facility at which Alexander is currently incarcerated.

Alexander had a job doing maintenance and custodial work for an apartment building in Milwaukee. He would often hire two girls who lived in the building to help him with cleaning work: AKG, who was nine years old at the times of the events in question, and PLF, who was 11.

In Milwaukee County Case No. 2009CF5916, Alexander was charged with two counts of first-degree sexual assault of a minor. The underlying allegations were that Alexander grabbed PLF's buttocks in a vacant apartment and then later that day raped AKG in a vacant apartment.

At Alexander's first trial, in May 2010, witnesses included AKG, PLF, Christina Hildebrand, the nurse examiner who treated AKG after the incident, and Debra Kaurala, a DNA analyst. After about six hours of deliberations, the jury reported that it had a verdict on one count but could not agree on the other count. The jury did not reveal its verdict to the court. The judge instructed the jury to continue deliberating and see if the members could agree on a verdict. After further deliberations, the jury reported that it no longer had a unanimous verdict on either count. Alexander's counsel moved for a mistrial, and the court granted the motion.

Alexander's second trial was in March 2011. The state presented largely the same evidence that it presented at the first trial. The jury found Alexander guilty on both counts, and Alexander was sentenced to 30 years of confinement (25 years for the assault of AKG and 5 years for the assault of PLF) and 13 years of extended supervision.

Alexander was appointed appellate counsel, who filed a postconviction motion alleging that Alexander's attorney at his second trial provided ineffective representation. The circuit court denied that motion without a hearing. *See* Dkt. 14-3, at 134. Alexander's appellate

counsel then filed a "no-merit" brief under Wis. Stat. § 809.32, Dkt. 14-2, which is Wisconsin's procedure for implementing *Anders v. California*, 386 U.S. 738 (1967). Alexander responded, identifying several issues he believed should be addressed on appeal. Dkt. 14-3. The Wisconsin Court of Appeals agreed with counsel that there was no arguable merit to any appealable issue and it affirmed the conviction. Dkt. 14-4; *see also State v. Alexander*, No. 2011AP2992-CRNM, 2014 WL 12664779 (Wis. Ct. App. Jan. 14, 2014).

The Wisconsin Supreme Court summarily denied Alexander's petition for review. Dkt. 14-7. Alexander then filed a pro se motion for postconviction relief under Wis. Stat. § 974.06, which raised several issues that had already been raised during the no-merit proceedings. The court of appeals held that the claims were procedurally barred. I have already determined that Alexander's claims are not procedurally barred for purposes of this habeas petition because the issues were raised in the original no-merit proceedings. *See* Dkt. 26, at 4.

ANALYSIS

In his habeas petition, Alexander seeks relief on the grounds that the second trial violated the Double Jeopardy Clause of the Fifth Amendment, his trial and appellate counsel was ineffective, and that some of those violations also violated his right to due process.

With some exceptions addressed below, the Wisconsin Court of Appeals addressed the merits of Alexander's claims during the no-merit-appeal proceedings, so this court's review is subject to the deferential standard of review under 28 U.S.C. § 2254(d). Under § 2254(d)(1), Alexander must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

3

Court." A decision is contrary to clearly established federal law if it applies a rule that is different from governing law set forth in Supreme Court cases. *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013). A decision involves an unreasonable application of Supreme Court precedent if the decision identifies the correct governing rule of law, but it applies the law unreasonably to the facts of the case. *Id*. To show that a state court decision was unreasonable, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Alternatively, Alexander can obtain relief if he shows that the state court's adjudication of his claims was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). But again, the federal court owes deference to the state court. The underlying state court findings of fact and credibility determinations are presumed correct unless the petitioner comes forth with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014).

## A.  Double jeopardy

The Double Jeopardy Clause states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. The clause "guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Blueford v. Arkansas*, 566 U.S. 599, 605 (2012) (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569 (1977)).

In denying Alexander's no-merit appeal, the court of appeals applied *Wheeler v. State*, 87 Wis. 2d 626, 633, 275 N.W.2d 651 (1979), which in turn cited *United States v. Perez*, 22 U.S. 579, 580 (1824), for the proposition that it does not violate the Double Jeopardy Clause to retry a defendant after a mistrial is declared because of a hung jury. So the court identified the correct standard to apply to this claim.

Alexander contends that his right to be free from double jeopardy was violated because the jury had reached a partial verdict during its deliberations at the first trial: the foreperson announced that the jurors unanimously agreed as to one of the counts, but could not agree on the other count. *See* Dkt. 14-28, at 8–12. But this type of argument has already been rejected by the United States Supreme Court: in *Blueford*, the Court stated that the Double Jeopardy Clause did not prohibit a second trial when jury foreperson announced that the jurors had unanimously voted to acquit on two of the counts, but the trial court did not immediately accept the partial verdict and the jury later announced that it was deadlocked after further deliberations. The Court concluded that the jury's announcement "was not a final resolution of anything." *Blueford*, 566 U.S. at 606. That's the same problem that Alexander has. If anything, his double-jeopardy argument is weaker than Blueford's claim because the jury at Alexander's first trial did not announce that it had voted to acquit; the foreperson did not say whether the jurors agreed to find Alexander guilty or not guilty. *See* Dkt. 14-28, at 8–12. So Alexander's double-jeopardy claim fails under *Perez* and *Blueford*.

## B. Ineffective assistance of counsel and due process

Alexander raises several claims based on the alleged ineffectiveness of his trial and appellate counsel, adding that his due process rights were violated by a couple of those violations. The Wisconsin Court of Appeals identified the correct standard to use in

considering the ineffective assistance of counsel claims, citing *State v. Snider*, 2003 WI App 172, ¶ 20, 266 Wis. 2d 830, 668 N.W.2d 784, which relied on the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). To prevail under the *Strickland* standard, a petitioner must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency. *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

To demonstrate deficient performance, Alexander must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. Counsel's errors must have been "so serious as to deprive the [petitioner] of a fair trial." *Id.* at 687. "This means identifying acts or omissions of counsel that could not be the result of professional judgment." *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011) (internal quotations and citations omitted). To demonstrate actual prejudice, Alexander must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

To prevail on an ineffective assistance of counsel claim under the deferential standard in § 2254(d), the result is a doubly deferential form of review that asks "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington,* 562 U.S. at 89. This means that only a clear error in applying *Strickland* will support a writ of habeas corpus. *Allen v. Chandler,* 555 F.3d 596, 600 (7th Cir. 2009). So long as the Wisconsin Court of Appeals "took the constitutional standard seriously and produced an answer within the range of defensible positions," this court must deny relief. *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (citation omitted).

This is so even for claims that the state courts summarily rejected rather than denying following a well-reasoned decision; in that case, the petitioner must meet his burden "by showing there was no reasonable basis for the state court to deny relief." *Harrington,* 562 U.S. at 98.

### 1. Claims regarding AKG

#### a. Trial counsel's failure to seek exclusion of state's expert testimony and DNA evidence

Most of Alexander's remaining claims concern his conviction for assaulting AKG, the conviction for which he received the bulk of his sentence. I will start with those claims. Alexander contends that his trial counsel should have moved for a pretrial hearing to exclude the testimony of the state's experts, Christina Hildebrand and Debra Kaurala, as well as the DNA evidence presented during Kaurala's testimony. Alexander also contends that his due process rights were violated because there was no probative value to this evidence and it prejudiced him unfairly.

Specifically, Alexander refers to parts of nurse examiner Hildebrand's testimony at the first trial, in which she explained that she performed only an external gynecological exam of AKG instead of using a speculum to perform an internal exam. Hildebrand said that she didn't use the speculum because AKG "had not yet reached the full stages of puberty yet . . . . She was not sexually active." Dkt. 14-24, at 105. She also stated that AKG's hymen had a "transection"—a separation of tissue—that Hildebrand thought could have been a tear or cut. Alexander says that Hildebrand admitted that the transection could "just be how [AKG] developed" instead of being caused by trauma. *Id.* at 109.

Alexander's focus on Hildebrand's testimony at the first trial is flawed for at least two reasons. First, that trial ended in mistrial, so Hildebrand's testimony at that trial did not actually have any direct bearing on the convictions in this case. If what Alexander means is that Hildebrand's testimony at the first trial should have spurred his counsel to move to exclude her testimony at the second trial, he runs into a second problem: he attacks only small parts of Hildebrand's testimony, but at both trials, the sum of her testimony was clearly probative and not unfairly prejudicial. At both trials Hildebrand testified about six injuries to AKG's labia, hymen, and perihymenal tissue, and she stated that they were consistent with AKG's version of events, in which AKG was penetrated by the assailant's finger and penis. Testimony from a nurse about her examination of an alleged sexual assault victim is clearly evidence probative to the question whether an assault occurred. The evidence was indeed harmful to Alexander's defense but it wasn't *unfairly* prejudicial—it focused on the entirely appropriate question of whether the examination showed that AKG had been assaulted.

Alexander also argues that counsel was ineffective for failing at the second trial to impeach Hildebrand with the above excerpts of her testimony from the first trial; Alexander believes that Hildebrand's testimony was inconsistent between the trials. The court of appeals explicitly addressed this argument:

> This testimony was not inconsistent. Hildebrand testified that she did not use a speculum during the examination because the victim had not been sexually active before she was assaulted. The fact that the victim's hymen was transected during the assault is not inconsistent with the fact that the victim was a child who was not sexually active.

*Alexander*, 2014 WL 12664779, at *5.

The court of appeals is correct that Hildebrand's testimony between the trials wasn't materially inconsistent. Rather, Alexander misconstrues these portions of Hildebrand's

testimony. Alexander appears to believe that Hildebrand's statement at the first trial that AKG was "not sexually active" meant that AKG had not been raped. But that is not a reasonable interpretation of Hildebrand's statement—the point was that AKG had not been sexually active before the assault. Hildebrand clearly wasn't ruling out assault: her conclusion was that AKG's injuries were indeed consistent with AKG's version of events.

As for Hildebrand's statement at the first trial that one of the transections of AKG's hymen could have been part of her natural development, Alexander's briefing leaves out her surrounding testimony. Hildebrand admitted at the first trial that the transection "could be" caused naturally, but she went on to say that if the transection had developed naturally, it would not cause AKG pain, which was at odds with AKG's testimony that she indeed felt pain. Dkt. 14-24, at 109. At the second trial, Hildebrand didn't offer her opinion that the transection could have occurred naturally, which Alexander calls inconsistent. But there's no reason to think that counsel at the second trial pointing this out would have helped Alexander, given that Hildebrand discounted this theory because of AKG's pain, not to mention the other five injuries that Hildebrand discussed in her testimony. Given the sum of Hildebrand's testimony, Alexander comes nowhere close to showing that the court of appeals unreasonably applied *Strickland* with regard to the failure to impeach Hildebrand.

As for DNA analyst Kaurala, she testified that buccal swabs were taken from Alexander, AKG's younger brother, and AKG's mother's boyfriend to compare to the swabs taken from AKG and her clothing. Kaurala tested a sample of saliva taken from AKG's neck, and she stated her expert opinion that the saliva contained Alexander's "autosomal" DNA—only 1 in 7 trillion people would have the same profile. *See* Dkt. 14-32, at 111; Dkt. 14-33, at 8. She also presented evidence of "Y-STR" DNA profiles; Kaurala explained that a Y-STR DNA profile

looks only at DNA markers on the Y chromosome. This allows scientists to isolate male DNA from a sample that otherwise mostly contains female DNA (for example, AKG's underwear). But unlike an autosomal DNA profile, such as the one developed from the saliva on AKG's neck, a Y-STR profile is not precise enough to truly identify an individual source; for instance, all male members in a paternal line share the same Y-STR profile.

Kaurala made a Y-STR profile from AKG's underwear; there was a mixture of DNA from at least two males. She could not conclude that the sample was consistent with Alexander's Y-STR profile, but neither could she exclude Alexander as a contributor. *Id.* at 102. Similarly, she could neither include nor exclude AKG's brother or AKG's mother's boyfriend as contributors.

Swabs from AKG's labia resulted in a Y-STR DNA profile consistent with Alexander's profile but not with the profiles of AKG's brother or her mother's boyfriend. According to Kaurala, the probability of randomly selecting an African American male unrelated to Alexander with the same Y-STR profile from the labial swab was 1 in 37. *Id.* at 111–113.

Swabs from a gauze pad that AKG used to wipe her vaginal area resulted in a Y-STR DNA profile with a mixture of two males. The profile found in larger concentration was consistent with Alexander's profile but not with the profiles of AKG's brother or her mother's boyfriend. According to Kaurala, the probability of randomly selecting an African American male with the same Y-STR profile as found in the gauze pad was 1 in 1,511. *Id.* at 113–115. Kaurala could also rule out AKG's mother's boyfriend for the profile found in lesser concentration in that swab, but she could not make any conclusions about AKG's brother.

There were also samples from which no DNA was recovered, such as swabs from AKG's inner thighs, mouth, and vagina, as well as pubic hair combings.

Alexander contends that the DNA evidence had no probative value because it did not definitively prove that he assaulted AKG, and he contends that therefore the state failed to prove his guilt. But there is no requirement that evidence needs to definitively prove something to be admissible. In this case, the saliva autosomal DNA was probative because it identified Alexander's saliva on AKG's neck; this corroborated AKG's testimony that Alexander kissed her neck during the assault. The Y-STR profiles from AKG's labia and gauze pad had significant probative value because they were consistent with Alexander's profile and not the profiles of AKG's brother or her mother's boyfriend. The evidence was not unduly prejudicial or misleading to the jury: Kaurala made clear in her testimony that Y-STR DNA could not be used to make a precise identification the way that autosomal DNA can. Dkt. 14-32, at 100–01. Alexander points to the fact that swabs from AKG's inner thighs, her mouth, "vaginal smear," and pubic hair did not reveal incriminating DNA evidence, but that doesn't mean that the swabs implicating Alexander were inadmissible. All of the test results had some probative value and it was up to the jury to decide how to weigh them.

Alexander also contends that his trial counsel was ineffective for failing to properly cross-examine Kaurala. The court of appeals did not explicitly address each of the following arguments, but I conclude that each argument is plainly meritless.

Alexander says that trial counsel's cross-examination was poor because counsel did not understand DNA evidence because his lawyer prefaced a question on cross-examination to Kaurala by saying, "I want to make sure I understand because I don't know a lot about this." Dkt. 14-33, at 8. But as pointed out by the court of appeals, "[l]awyers often review information carefully and slowly with witnesses in order to help the jury understand the information and ask questions so that a lay person without specialized knowledge can

comprehend what is being explained." *Alexander*, 2014 WL 12664779, at *4. The statement was at least partly a rhetorical flourish. From the transcripts of the testimony and Alexander's counsel's closing argument, there's no reason to think that counsel was unable to understand the evidence Kaurala presented. The court of appeals was correct to reject this argument.

Alexander also argues that counsel failed to impeach Kaurala with he believes were inconsistent statements between the first and second trials. Alexander says that during the first trial, Kaurala testified that no male DNA was found on AKG's vaginal swab, but during the second trial, Kaurala testified that Y-STR DNA was recovered from AKG's labial swabs and the gauze pad from her vaginal area. These statements are all true: Kaurala tested three different sets of swabs taken from AKG's genital area: labial swabs, a vaginal swab, and a gauze pad. And during both trials, Kaurala testified about all three sets of swabs. *Compare* Dkt. 14-25, at 47–54 *with* Dkt. 14-32, at 104–14. Her testimony between the first and second trial was virtually identical: not all three sets showed DNA consistent with Alexander. Counsel didn't fail to elicit testimony about the vaginal swabs from Kaurala.

Alexander argues that counsel failed to impeach Kaurala by comparing the DNA test results to the information about Alexander's samples in the Wisconsin DNA databank, or by questioning how Kaurala was able to get DNA results from such small samples of biological material. But other than his own speculation, he doesn't explain what basis he has for thinking that these issues were problems with Kaurala's testimony that counsel should have probed. That isn't enough to support a claim for habeas relief.

Similarly, Alexander states that counsel was ineffective for failing to hire his own expert. The court of appeals concluded that Alexander had not been prejudiced by his counsel's decision to not call a defense expert because "he did not explain what an outside DNA expert

would have testified to that would be of significance to his case." *Alexander*, 2014 WL 12664779, at *3. Alexander still does not explain how a defense expert would have made a difference; all he does is speculate that an expert could have helped him. The court of appeals' decision was not unreasonable: Alexander can't win relief from his conviction without some evidence showing how an expert would have helped him.

### b. Trial counsel's failure to impeach AKG with prior inconsistent statements

Alexander says that portions of AKG's testimony at the second trial was inconsistent with previous accounts she made to the police, to examining nurse Hildebrand, and at the first trial. In particular, Alexander states:

- At the second trial, AKG said that the assault lasted ten minutes, but in some of her previous accounts she said that it lasted two to three minutes.

- At the second trial, AKG said that she heard Alexander click the lock on a door before he gave her an awkward hug leading into the assault. But previously, AKG had stated that Alexander clicked a lock after the hug and before the assault.

- At the second trial, AKG testified that the assault happened in the hallway outside the bathroom of a vacant apartment. But in her statement to nurse examiner Hildebrand the evening of the assault, she stated that the assault occurred in the bathroom itself.

Alexander says that trial counsel was ineffective for failing to point out these inconsistencies at the second trial, but counsel *did* point out two of those inconsistencies during AKG's cross-examination: (1) the discrepancy in AKG's explanation of the length of the assault wavering between three and ten minutes, Dkt. 14-32 at 31–32, and (2) the discrepancy in the timing of Alexander locking a door either before or after hugging AKG, *id.* at 28–31. As for the location of the assault, Hildebrand testified about much of the report at the second trial, including AKG's narrative suggesting that the assault happened in the bathroom itself. And Alexander's counsel made note of that in his closing argument, stating, "However, when she

13

told Miss Hildebrand, she said it was the bathroom door that locked. So that didn't make a lot of sense either." Dkt. 14-33, at 52. So the jury was indeed informed of that discrepancy in AKG's testimony too. Alexander's argument about counsel failing to raise these discrepancies is meritless because counsel did indeed raise them.

Alexander also says that AKG's testimony at the second trial about how male DNA could have gotten on her underwear contradicted her testimony from her first trial. At the first trial she testified that the DNA likely came from her brother folding her clothes, Dkt. 14-24, at 72, but at the second trial she said that her mother's boyfriend folded the laundry. Dkt. 14-32, at 44. The court of appeals said that Alexander's trial counsel "*did* point out alleged inconsistencies in the testimony where it was appropriate to do so throughout the trial," *Alexander*, 2014 WL 12664779, at *3 (emphasis in original), which is incorrect because counsel did not point out this particular inconsistency.

But even considering the *Strickland* question de novo with regard to this argument, Alexander is not entitled to habeas relief. AKG's inconsistency was about a minor point—which of the two other sampled males' DNA could have been present in the underwear sample. The jury did hear the evidence that the underwear sample contained more than one male's DNA and that none of the three potential donors (Alexander, AKG's brother, and AKG's mother's boyfriend) could be confirmed or ruled out. Despite the inconclusive nature of the underwear evidence, the jury convicted Alexander, aided by the other DNA evidence pointing more squarely toward Alexander, as well as AKG's own testimony about the assault. If Alexander's point is that counsel harmed him by failing to raise another piece of evidence showing inconsistencies in AKG's various accounts of the events, it's not reasonable to think that this minor inconsistency could have changed the jury's calculus. The jury had already heard about

14

other more serious inconsistencies in AKG's testimony and convicted Alexander anyway, presumably because her credibility was significantly bolstered by the DNA evidence incriminating Alexander and the medical evidence of AKG's injuries. Because counsel's failure to impeach AKG on this inconsistency did not prejudice him, he is not entitled to relief on this claim.

Alexander argues that counsel should have shown him a portion of a recorded interview in which AKG said that Alexander was the only person who ever touched "the sexual areas" of her body or that kissed her on the mouth. Dkt. 17, at 13. He also argues that counsel should have impeached AKG with the recording because the DNA evidence showed other male DNA on her underwear and mouth. Alexander styles his claim against counsel for failing to make him aware of the recording as a violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), which is incorrect—*Brady* concerns the duty of the prosecutor to turn over material evidence favorable to the accused. *Id.* at 87. He also calls it an ineffective assistance of counsel claim, which is closer to the mark, but the claim still fails because he cannot show prejudice. The recording was consistent with AKG's trial testimony: she did not testify at trial that someone else had touched or kissed her. So the recording itself added nothing to the case, and counsel was not ineffective for failing to share it with Alexander or the jury. Alexander is correct that the DNA evidence on AKG's underwear and mouth potentially raised inferences contradicting her testimony, but that DNA evidence was indeed presented to the jury, and it convicted Alexander anyway.

**c. Trial counsel's failure to call witnesses who would contradict AKG's testimony**

Alexander contends that his trial counsel failed to subpoena and call as witnesses AKG's neighbors Gloria Bentley and Keisha Foster, who he says would have undermined AKG's credibility by rebutting AKG's statement that following the assault she immediately went back to her own apartment. Alexander says that Bentley and Foster would have testified that around that time, AKG accompanied Alexander as he went door to door to ask for change for a $50 bill so that Alexander could pay AKG $10 for her help in performing maintenance tasks.

The court of appeals concluded that Alexander had not shown that he was prejudiced by his counsel's failure to call Bentley:

> The circuit court properly denied the motion without a hearing. . . . Alexander did not allege sufficient facts to show that he was prejudiced by Bentley's failure to testify. He has not attached an affidavit from Bentley to show what her testimony would have been. According to the postconviction motion, Bentley would have testified that the victim came to her door with Alexander shortly after the assault to ask for change for a $50 bill and, at that time, it did not appear to Bentley that there was anything wrong with the victim. Even if Bentley testified as Alexander claims she would, we agree with the circuit court that the purported testimony would not have been "sufficient to damage the credibility of the victim or alter the outcome of the case."

*Alexander*, 2014 WL 12664779, at *3. The court appears to have been incorrect when it said that Alexander dd not provide a copy of Bentley's affidavit, because the affidavit is attached Alexander's no-merit-appeal response. *See* Dkt. 14-3, at 80. Nonetheless, the affidavit says what Alexander told the court it said: Bentley saw AKG with Alexander asking for change for a $50 bill, and that AKG "was not crying." *Id.* So the court analyzed a correct summary of Bentley's affidavit. The court's conclusion was that Bentley's testimony would not have been sufficient to damage AKG's credibility. The court of appeals followed the reasoning of the circuit court,

which stated that Bentley's testimony would not have damaged AKG's credibility or altered the outcome of the case because Bentley "was not present in the apartment where the sexual assault occurred." Dkt. 14-3, at 134.

This isn't an unreasonable application of *Strickland*'s prejudice prong.[2] Bentley wasn't an eyewitness to what happened inside the vacant apartment. So her testimony could not have directly contradicted AKG's testimony about the assault itself. It may have chipped away at AKG's credibility more generally, and I understand the logic of Alexander's argument that one might not expect a victim of sexual assault to remain in close proximity to the assailant following the assault. Counsel had already raised other inconsistencies in AKG's testimony, and the more evidence that counsel could marshal to impeach AKG's credibility the better.

But "[i]n weighing the effect of counsel's errors, the court must consider the totality of the evidence before the judge or jury." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001). A verdict that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record. *Id. See also Strickland*, 466 U.S. at 696. The jury convicted Alexander despite counsel raising various inconsistencies in AKG's testimony, and it's understandable why: the medical evidence showed injuries consistent with AKG's version of events and the DNA evidence incriminating Alexander was also consistent with AKG's account. Inconsistencies at the margins of AKG's account weren't enough to sway the jury. And as I'll discuss further below, the jury also convicted Alexander on the assault of

---

[2] It's not obvious that counsel was deficient in failing to have Bentley testify given her change of heart after providing an affidavit. Although neither the parties nor the state courts discuss it, Alexander's counsel indeed attempted to subpoena Bentley, but his investigator reported that Bentley refused to accept a subpoena from the investigator, instead saying, "If I have to testify in court, I don't know shit. I will forget everything!" Dkt. 14-3, at 82. It's possible that counsel concluded that it wouldn't ultimately have been helpful to call Bentley.

PLF even though there was a similar question of PLF spending time with Alexander after her assault. The court of appeals' conclusion that there wasn't a reasonable probability that Bentley's testimony would alter this balance is a conclusion that fairminded judges could reach. So I will not grant Alexander habeas relief on this aspect of his claims.

The court of appeals did not explicitly address Foster's testimony, and unlike with Bentley, Alexander does not have an affidavit from her. But what he has provided shows that Foster would have been even less helpful to his defense. Alexander attached to his no-merit response a copy of an email from his trial counsel's investigator to counsel, stating that Foster said, "'I saw the little girl. She was crying and was very distressed." Dkt. 14-3, at 90. Even if I infer that Foster in fact was referring to seeing AKG at her door with Alexander regarding change for the $50 bill, the testimony that AKG was crying and "very distressed" actually tends to corroborate the key part of AKG's testimony—that she was assaulted—even if it undermines AKG's statement that she did not go around with Alexander asking for change. It was clearly reasonable for counsel not to have Foster testify in a way that would almost certainly damage Alexander.

### 2. Claims regarding PLF

At the second trial, PLF testified that after Alexander grabbed her buttocks, she went to AKG's apartment but she did not tell AKG or AKG's mother about the assault. Dkt. 14-31, at 38. Alexander contends that this was inconsistent with a police report memorializing AKG's statement saying that while PLF's mother and AKG's mother were waiting to talk to the police about AKG's assault, PLF told them that Alexander smacked her buttocks, Dkt. 17-2, at 2, and he argues that counsel should have pressed PLF on this contradiction. But these statements do not actually contradict each other: the statement that PLF made at trial concerned the time

immediately following PLF's assault, *before* AKG had been assaulted. The statement in the police report is about an event occurring later that day, after AKG had been assaulted. So this wasn't a discrepancy that counsel needed to point out on cross-examination.

Alexander also says that counsel should have asked PLF about why she didn't act like someone who had just been sexually assaulted—she didn't immediately go back to her own apartment to tell her mother about the assault; instead she went back with AKG to spend time with Alexander soon after the assault. But Alexander's counsel did cross-examine PLF on these topics: he asked PLF why she didn't immediately go home, and he elicited testimony about PLF not telling AKG about the assault and instead how she and AKG spent time with Alexander later that day. Dkt. 14-31, at 58–65. PLF's responses were that she was scared and confused, and she "didn't know what [she] should have done." *Id.* at 59–66. Counsel also discussed that testimony in his closing arguments, using it to challenge PLF's credibility. *Id.* at 48–49. So Alexander is incorrect when he contends that counsel failed to impeach PLF on this issue.

Alexander says that his counsel should have submitted the original criminal complaint, which included charges for the assault of AKG but not for the assault of PLF. But the district attorney's charging decisions have nothing to do with PLF's credibility and they are not evidence of what actually occurred. So Alexander can't show that he was prejudiced by counsel failing to submit the complaint as evidence.

Alexander says that counsel should have investigated AKG's and PLF's mothers' motives to potentially get their daughters to fabricate the assaults out of jealousy because Alexander was dating both of the mothers at that time. The court of appeals stated the following about this argument:

> [Alexander] contends that [counsel] failed to investigate motives
> that the victims might have had to provide false testimony. He

> states that the mothers of both victims might have been jealous of one another because he had dated both of them, and they could have caused their daughters to lie about the assaults due to their jealous feelings. There is nothing whatsoever in the record before us that supports these bald assertions. Moreover, if Alexander thought that the victims might have a motive to lie, he should have informed his lawyer of that fact, rather than fault his lawyer on appeal for failing to investigate on appeal. There would be no arguable merit to this claim.

*Alexander*, 2014 WL 12664779, at *3.

In his habeas briefing, Alexander doesn't explain how this reasoning is wrong, only citing one piece of evidence, from a police report memorializing interviews with AKG and her mother, AMG:

> AMG further states that [PLF's mother and Alexander] seem close and he spends much time with [PLF's mother], AMG suspects that they could be dating but AMG is not sure of this, AMG also felt offended because [PLF's mother] questioned her as though her daughter AKG might be lying about the assault.

Dkt. 14-3, at 86. Alexander also now says that he told trial counsel that he was dating both mothers. In his no-merit-appeal response, he didn't say that he told trial counsel that he was dating both mothers, so there's no basis for saying that the court of appeals' reasoning on this issue was incorrect.

But even if I considered the issue de novo with the benefit of Alexander's new briefing and evidence, I would not conclude that counsel was ineffective. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Even with his additional briefing, Alexander presents no more than utter speculation that the mothers coached their daughters into falsifying their accusations against him. Without more evidence showing that investigating this issue further would have been reasonable, Alexander fails to show that counsel was deficient in this regard.

20

### 3. Ineffective assistance of appellate counsel

Alexander contends that his appellate counsel was ineffective for filing a no-merit brief instead of consulting with him and raising on appeal the multiple meritorious arguments he identified. But I've already concluded that Alexander's double-jeopardy claim is meritless. And because the rest of Alexander's claims against his appellate counsel are predicated on trial counsel's alleged errors, "the two claims rise and fall together." *Johnson*, 624 F.3d at 793. Alexander has not shown that trial counsel was ineffective for any reason so Alexander cannot succeed on a claim that appellate counsel should have challenged trial counsel's performance. Accordingly, Alexander is not entitled to relief on this claim.

## C. Certificate of appealability

Under Rule 11 of the Rules Governing Section 2254 Cases, the court must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted). Although the rule allows a court to ask the parties to submit arguments on whether a certificate should issue, it is not necessary to do so in this case. For the reasons already stated, I conclude that Alexander has

failed to make a substantial showing of a denial of a constitutional right. Because reasonable jurists would not otherwise debate whether a different result was required, I will not issue Alexander a certificate of appealability.

ORDER

IT IS ORDERED that:

1.  Petitioner Ricky N. Alexander's petition for a writ of habeas corpus under 28 U.S.C. § 2254, Dkt. 1, is DENIED.

2.  Alexander is DENIED a certificate of appealability. He may seek a certificate from the court of appeals under Fed. R. App. P. 22.

Entered August 13, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge